IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA      *
                              *
v.                            *
                              *   Criminal No. WMN-06-0394
LEEANDER JEROME BLAKE         *   Civil Action No. WMN-11-80
                              *
    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM**

After a seven day trial, a jury found Defendant Leeander

Jerome Blake guilty of numerous offenses related to the

September 19, 2002, carjacking and murder of Straughan Lee

Griffin in Annapolis, Maryland.  This Court sentenced Defendant

to life imprisonment on August 16, 2007.  Defendant filed an

appeal and his conviction and sentence were affirmed.  United

States v. Blake, 571 F.3d 331 (4th Cir. 2009), cert. denied,

Blake v. United States, 130 S. Ct. 1104 (2010).  Defendant has

now filed a Motion under § 2255 to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody.  ECF No. 80.  The

government has responded to the motion, and Defendant has

replied.  Upon review of the pleadings and the applicable case

law, the Court finds no merit in Defendant's claim and that his

motion should be dismissed, without a hearing.  See 28 U.S.C. §

2255 (providing that a hearing is not required "where the motion

and the files and records of the case conclusively show that the

prisoner is entitled to no relief").

Defendant raises a single claim of error in the trial proceedings.  He asserts that his trial counsel was ineffective in failing to file a motion to suppress his post-arrest statement on the ground that his arrest was unconstitutional. Specifically, Defendant posits that the affidavit submitted by the Annapolis police in order to obtain his arrest warrant omitted information related to statements made by his accomplice, Terrance Tolbert, denying involvement in the carjacking and murder.  Defendant concludes that the fact that Tolbert had previously lied would have undermined the probable cause determination based upon Tolbert's subsequent statement implicating himself and Defendant in the crimes.

The facts concerning Tolbert's statements to investigators are largely undisputed and were summarized by the Maryland Court of Appeals when resolving issues related to the voluntariness of statements Tolbert gave to the police.

> The police became interested in [Tolbert] as a possible witness or suspect because they had received information that the suspects in the murder were two black males, one of whom had a missing arm; [Tolbert] is a black male who is missing one arm.  On October 16, 2002, several officers went to [Tolbert]'s home, where he lived with his mother.  Corporal Thomas Hannon explained that the police wanted to talk to [Tolbert] and his mother about the homicide. [Tolbert] agreed to go to the police station and answer questions.  During the questioning, which lasted approximately half an hour, [Tolbert] denied that he knew anything about the murder and provided an alibi.  He returned home.

. . .

The following day, Detective Cordle contacted
[Tolbert]'s mother and asked if she would meet with
him.  [Tolbert]'s mother and sister went to the
State's Attorney's Office that afternoon and met with
Detective Cordle and Detective Kevin Lloyd.  The
detectives asked [Tolbert]'s mother for her help in
getting [Tolbert] to cooperate and talk with the
police.  [Tolbert]'s mother said that she could not
force her son to talk to them but that she would
encourage him to do so.  Detective Cordle set up
another meeting with [Tolbert]'s mother for the
following week.  At that meeting, on October 24, 2002,
Detectives Cordle and Lloyd discussed the possibility
of [Tolbert] taking a polygraph examination and
persuaded [Tolbert]'s mother to bring him into the
State's Attorney's Office the following day.

On October 25, 2002, [Tolbert] and his mother met with
Detective Cordle, Detective William Johns, and
Corporal Hannon at the State's Attorney's Office. . .
.  Detective Cordle asked [Tolbert] whether he would
be willing to take a polygraph test to verify his
unwavering claim that he had no involvement in the
murder.  Although at first reluctant, [Tolbert] agreed
to take the polygraph examination.

. . . .  Corporal White explained to [Tolbert] that
the test would take approximately two hours and
consisted of three phases—a pre-test interview, the
instrumentation phase, and a post-test interview.
[Tolbert] expressed reluctance about taking the test.
After Corporal White told him that he "did not want to
make him do anything he didn't want to do," [Tolbert]
said that he did not want to take the test. . . .

. . .  After some time passed, [Tolbert] changed his
mind about taking the polygraph test and told Corporal
White that he wanted to get it over with.  Corporal
White then took [Tolbert] back to the polygraph suite.

. . .  After asking [Tolbert] some background
information about his education, employment, and
health, Corporal White went over the polygraph
questions with [Tolbert] and then administered the
actual test. . . .  Corporal White told [Tolbert] that

> he had shown deception during the test, and [Tolbert]
> responded by asking whether the polygraph indicated
> that he had shot the victim.  Corporal White asked
> [Tolbert] why he would ask such a question and told
> him that, if [Tolbert] had any involvement in the
> murder, he should say so.  [Tolbert] was quiet for
> several minutes and then admitted that he was more
> involved than he had said during the test.  He then
> spoke for about five minutes, making a statement
> implicating himself in the murder and finally stating,
> "I guess it's a robbery gone bad."

State v. Tolbert, 850 A.2d 1192 (Md. 2004).

In the statement Tolbert made to the police on October 25, 2002, he also implicated Defendant in the carjacking and murder.

> Tolbert told detectives that he and Blake, whom he
> initially described by his nickname, "Sweater", or as
> "B", had been walking through Annapolis; that the
> defendant, Blake, had a gun; that they decided to
> commit a robbery and were looking for a car to steal;
> that they spotted and approached Mr. Griffin; that
> they didn't say anything to the victim; and that Blake
> pulled out the gun and shot the victim in the head.
> Tolbert stated that after the murder they took the
> Jeep and drove away from the area, pulling over at one
> point to allow a police car to pass.  Tolbert also
> stated that they drove the Jeep to Glen Burnie and
> abandoned it in a neighborhood he knew.
>
> In subsequent questioning that day, Tolbert identified
> "Sweater" as the defendant, Jerome Blake, of 1376
> Tyler Avenue.  He also added that the gun was a .38
> caliber revolver.  He described that he and Blake
> wiped the Jeep down before leaving it in Glen Burnie.
> Tolbert also reiterated that Blake shot Mr. Griffin
> "in the face" as the victim was removing some clothing
> from the rear of the Jeep.

ECF No. 16 at 9-11 (Gov't Opp'n to Mot. to Suppress).

In the affidavit presented by Detective Johns in support of the warrant for Defendant Blake's arrest, he stated,

4

On 09/19/02 at about 1932 hours officers of the
Annapolis Police Department were called to 1
Cumberland Court, Annapolis.  Investigation showed
that Straughan Lee Griffin had been shot in the head,
his Jeep had been stolen and he had been run over by
the Jeep as the suspects fled the area.  During the
course of the investigation Terrence Tolbert was
identified as a possible suspect. On 10/25/02 Tolbert
was interviewed and admitted to being one of the two
people who was involved in the shooting death of
Straughan Lee Griffin.  Tolbert was able to provide
accurate, intimate details of the event.  Tolbert
advised that he was with a subject named Jerome Blake
who lives at 1276 Tyler Avenue, Annapolis.  Police and
Motor Vehicle records showed one Leeander Jerome Blake
of that address.  A photo of Blake was shown to
Tolbert and he positively identified him as the person
he was with on 09/19/02 and the person who shot
Straughan Lee Griffin.  The investigation revealed,
and Tolbert confirmed, that Tolbert and Blake
approached Straughan Griffin and pointed a handgun at
him with the intention of robbing him.  Mr. Griffin
resisted and was immediately shot in the head and fell
to the ground.  Blake removed the keys to Mr.
Griffin's 2000 Jeep Grand Cherokee from Mr. Griffin's
pants pocket and both subjects entered said vehicle.
Blake drove from the scene, running over Mr. Griffin
in the process.  Mr. Griffin later died of his
injuries.  The Jeep was later found in Glen Burnie.

Gov't Opp'n, Attach. 1.

Defendant does not assert that any of the facts included in

the police affidavit were not accurate representations of the

statements made by his co-defendant, Tolbert.  Instead, he

faults the affiant for omitting Tolbert's earlier denial of any

involvement in the murder.  Defendant contends that, had the

police officer included in the affidavit that Tolbert had

initially lied to the police and denied knowing anything about

the murder, the magistrate would not have found Tolbert to be a

credible source, would not have found probable cause, and would not have issued the arrest warrant.  More to the point, in relation to Defendant's present motion, he argues that, had his trial counsel moved to suppress his post-arrest statements on the ground that this omission rendered his arrest as one without probable cause, those post-arrest statements would have been suppressed and, without those statements, he could not have been convicted.

To establish a claim of ineffective assistance of counsel a petitioner must show that counsel's performance was constitutionally deficient to the extent that it fell below an objective standard of reasonableness, and that he was prejudiced thereby.  Strickland v. Washington, 466 U.S. 668, 687-91 (1984). In making this determination, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance.  Id. at 689; see also Fields v. Attorney Gen. of Md., 956 F.2d 1290, 1297-99 (4th Cir. 1992). Furthermore, the petitioner "bears the burden of proving Strickland prejudice."  Fields, 956 F.2d at 1297.  "If the petitioner fails to meet this burden, a reviewing court need not consider the performance prong."  Id. (citing Strickland, 466 U.S. at 697).

The Court finds that, had Defendant's trial counsel moved to suppress his post-arrest statement on the ground now advanced

by Defendant, the motion to suppress would have been denied.[1]  As explained below, even with the inclusion in the affidavit of the fact that Tolbert initially denied any involvement in the crime, probable cause existed for the issuance of the arrest warrant and the Court would have so found had the issue been raised in a motion to suppress.  Thus, Defendant cannot meet the prejudice prong of Strickland.

Defendant is essentially arguing that his trial counsel should have requested an evidentiary hearing under Franks v. Delaware[2] to test the validity of the arrest warrant.  In the Fourth Circuit, a Franks hearing is warranted if: (1) the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in a warrant affidavit, and (2) the defendant shows that the false information was essential to the probable cause determination. United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990); Simmons v. Poe, 47 F.3d 1370, 1383 (4th Cir. 1995).  The Franks

---

[1] The government suggests that this issue was at least implicitly raised in the extensive briefing and argument on Defendant's motion to suppress that was filed prior to trial.  That motion focused primarily on the manner in which Defendant was questioned by police after his arrest, not on the circumstances of his arrest.  The Court will assume for purposes of this motion that the issue of probable cause for arrest was not raised or addressed before trial.

[2] 438 U.S. 154 (1978).

test also applies when affiants omit material facts "with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." United States v. Reivich, 793 F.2d 957, 961 (8th Cir. 1986).

   With regard to the first prong and a claim of omission, the Fourth Circuit has held that Franks requires defendants "to allege more than 'intentional' omission in the weak sense." Id. The failure of the affiant to list every piece of information gathered or conversation held in the course of an investigation does not taint the warrant's validity. Colkley, 899 F.2d at 301.  Hence, a defendant must make some affirmative showing that the omission at issue was the result of a deliberate falsehood or of reckless disregard for the truth.  Id.  "The defendant's burden is a heavy one," and in seeking an evidentiary hearing he must not only allege the affiant's deliberate falsehood or reckless disregard for the truth but must accompany those allegations with an offer of proof. United States v. Jeffus, 22 F.3d 554, 558 (4th Cir. 1994).  The Fourth Circuit has also discouraged inferring bad motive from the mere fact of the omission alone, as such an inference collapses the two prongs of the Franks inquiry. Colkley, 899 F.2d at 301.  Furthermore, "to be material under Franks, an omission must do more than potentially affect the probable cause determination: it must be "necessary to the finding of probable cause."  For an omission

8

to serve as a basis for a hearing under Franks, it must be such that its inclusion in the affidavit would defeat probable cause for arrest.  Omitted information that is potentially relevant but not dispositive is not enough to warrant a Franks hearing." Colkley at 301.

There is certainly nothing remarkable about the fact that Tolbert initially denied any involvement in this very serious crime when first approached by the police.  An initial denial is part and parcel of most police investigations and there is no implication of a deliberate falsehood in Detective John's omission of those early conversations.  Furthermore, inclusion of that initial denial would not undermine the finding of probable cause based upon the inherent reliability of Tolbert's statements against his own interest.  Courts have long recognized the inherent reliability of statements of an accomplice who incriminates himself while also incriminating another.  See United States v. Brown, 366 F.3d 456, 459 (7th Cir. 2004) (observing that courts "that have dealt with inculpating statements in the probable cause context have held that such statements are weighty factors in establishing probable cause to arrest an alleged accomplice even if the statements have not been proven reliable"); United States v. Patterson, 150 F.3d 382, 386 (4th Cir. 1998) ("[I]t would be contradictory to allow a defendant to be convicted based on the

9

uncorroborated testimony of his co-perpetrator while refusing to find that the same statement would be sufficient to support probable cause."); Craig v. Singletary, 127 F.3d 1030, 1044-45 (11th Cir. 1997) (en banc) (same); United States v. Gaviria, 805 F.2d 1108, 1115 (2d Cir. 1986) (if informant participated in crime, authorities do not need to prove informant's prior trustworthiness when relying on his statements to establish probable cause to arrest alleged accomplice); Eain v. Wilkes, 641 F.2d 504, 510 (7th Cir. 1981) (noting that "[t]he uncorroborated testimony of an accomplice has been held sufficient to support even the higher reasonable doubt standard necessary for a criminal conviction.").

   Because Defendant cannot establish that the course Defendant now suggests his trial counsel should have followed would have led to a different result at trial, his motion pursuant to § 2255 will be denied.  A separate order will issue.


                         _____/s/_____
                         William M. Nickerson
                         Senior United States District Judge


DATED: January 10, 2012.